## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KASHAWNA HOLMES,<br><br>     *Plaintiff*,<br><br>  v.<br><br>UNIVERSITY OF THE DISTRICT OF COLUMBIA,<br><br>     *Defendant.* | Civil Action No. 15-2169 (RDM) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kashawna Holmes worked for the University of the District of Columbia in what municipal regulations call a "sponsored program appointment." *See* D.C. Mun. Regs. tit. 8-B, § 1700.1. The University declined to renew her appointment while she was on job-protected medical leave for complications arising from her high-risk pregnancy. In response, Holmes brought this suit against the University for violations of the D.C. Family Medical Leave Act ("DCFMLA"), the D.C. Human Rights Act ("DCHRA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Americans with Disabilities Act ("ADA"). The University now moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 19.

As alleged in the complaint, prior to her termination, Holmes had a number of "uncomfortable" interactions with the alleged decisionmaker, Elgoria Harrison, regarding her pregnancy, marital status, and use of pre-approved sick leave for pregnancy-related doctors' appointments. Not surprisingly, the parties paint very different pictures of those conversations. According to Holmes, the key takeaway is that Harrison conveyed her disapproval of Holmes's decisions to have a child out a wedlock and to take sick leave to attend to her pregnancy, and it

was that disapproval that prompted her termination.  The University, on the other hand, contends that Harrison's comments were entirely innocent and bear no relationship to its decision not to renew Holmes's employment.

As explained below, this factual dispute is not suited for resolution on a motion to dismiss, nor does the University identify any other sound basis to challenge the legal sufficiency of the complaint.  The Court will, accordingly, **DENY** the University's motion to dismiss.

## I.  BACKGROUND

In evaluating the University's motion to dismiss, the Court takes Holmes's factual allegations as true.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court also considers "documents incorporated into the complaint by reference" and "matters of which [it] may take judicial notice."  *Id.*

### A.      Structure of Holmes's Employment

Holmes began work as a Program Coordinator for the University on March 1, 2013.  Am. Compl. ¶ 13.  Her offer letter described her job as a "temporary sponsored program appointment," meaning the position's continued existence was contingent upon the availability of grant funding.  Dkt. 20-1 at 2 (Offer Letter).  "If funding for the position should no longer be available," the letter explained, "then the position must immediately end."  *Id.*  But her appointment had "been established" (*i.e.*, had received funding) through September 30, 2013.  *Id.*

Holmes's initial supervisor nonetheless assured her that her position "was permanent for all practical purposes."  Am. Compl. ¶ 16.  "[T]he grant that funded the position had been continuously renewed for approximately 30 years," she said, and "the employees who worked under that grant routinely had their employment continued."  *Id.*  For instance, the male employee who had most recently occupied the position had held it for five years before leaving voluntarily.  *Id.* ¶ 17.  The notice attached to Holmes's offer letter likewise explained that her

position, "while not permanent," was "essentially [an] indefinite term appointment[]." Dkt. 20-1 at 4. But, it explained, because "[t]here is no *automatic* right to continued employment"—even if the position is re-funded—the documentation needed "to correctly reflect the actual term of appointment under the current grant." *Id.* at 5 (emphasis added).

When Holmes's appointment expired on October 1, 2013, her employment "simply continued." Am. Compl. ¶ 18. On October 25, 2013, the University retroactively extended her appointment through September 30, 2014, Dkt. 20-1 at 9, apparently without needing to consult Holmes, *see* Am. Compl. ¶ 18. And Holmes later learned that the position had been funded through at least 2015. Am. Compl. ¶ 55.

**B.    Holmes's High-Risk Pregnancy**

In November 2013, Elgoria Harrison became Holmes's new supervisor, *id.* ¶ 20, and two months later, in January 2014, Holmes learned that she was pregnant, *id.* ¶ 22. This was not the first time Holmes had been pregnant; she had suffered several miscarriages in the past. *Id.* ¶ 23. Doctors therefore considered her pregnancy "high risk." *Id.* They advised her to consult a specialist, in addition to her regular obstetrician. *Id.* ¶ 30. And, given the risk that her pregnancy might end in another miscarriage, Holmes opted to keep the news to herself until later in her pregnancy. *Id.* ¶ 23.

Harrison, however, soon outed Holmes's condition. At a staff meeting in early 2014, Harrison pointed at Holmes's stomach, asking her, "Is there something you need to tell me?" *Id.* ¶ 24. "Feeling pressured," Holmes "reluctantly confirmed that she was pregnant." *Id.* ¶ 25. Harrison then "proceeded to pepper [her] with questions about her pregnancy," including "whether she was happy about [it]." *Id.* Holmes "felt extremely uncomfortable," as she "had only met . . . Harrison briefly before this meeting." *Id.* ¶ 26. She "could not believe that . . .

3

Harrison would put her on the spot to disclose her pregnancy in front of other employees like that." *Id.* And she "worried about what would happen if she miscarried," as she would now be "forced to explain it to her coworkers." *Id.*

Several weeks later, Harrison overheard Holmes mention "her roommate" during a breakroom conversation with a coworker. *Id.* ¶ 27. Unprompted, Harrison interrupted to inform Holmes—in front of several other employees—that Harrison personally "would never have considered having a baby when she was living with a roommate or in her parents' home" and that, "by the time [Harrison] had a baby, she was married and she and her husband had a house together." *Id.* Harrison knew at the time that Holmes was neither married to nor living with her child's father (who was then living overseas). *Id.* ¶ 28. Harrison's comments made Holmes feel "embarrassed," "self-conscious," and "ashamed." *Id.* ¶ 29. "She believed that . . . Harrison had expressed that she was irresponsible for having a baby when she was not married." *Id.*

Tensions again arose in early April, when Holmes took a sick day to attend two doctors' appointments (one for her regular doctor, and one for her specialist). *See id.* ¶¶ 30–31. "[A]s was standard procedure for [University] employees," Holmes requested leave in advance from the University's Human Resources Department, and "the director of the department" approved that request. *Id.* ¶ 31. As a courtesy, Holmes also emailed the employees with whom she worked, including Harrison, notifying them that she would be gone for the day. *Id.* ¶ 32.

Two days *after* the appointments, Harrison responded to that email. *Id.* ¶ 33. "I'm curious," she wrote to Holmes, "[d]oes your doctor require an all day appointment? I have not know[n] doctor's appointments to be all day; however, you may have a special case." *Id.* This inquiry, and its implication that Holmes had "somehow abus[ed] her sick leave," left Holmes feeling "upset and confused." *Id.* ¶ 34. The director of human resources had already approved

her leave.  *Id.* ¶ 31.  Harrison ordinarily played no role in such decisions.  *Id.*  Yet, after the fact, she was questioning whether Holmes had needed to take a full day of leave and was seeking personal medical information.  *Id.* ¶¶ 31, 34.  She accordingly went to see the director of human resources, where she confided that "she did not understand why . . . Harrison was asking these questions" and that "she thought . . . Harrison was trying to get rid of her."  *Id.* ¶ 35.  The director of human resources instructed her to answer Harrison's questions.  *Id.* ¶ 36.

At that point, Holmes "felt that she had no choice" but to disclose to Harrison that her pregnancy was high-risk.  *Id.* ¶ 37.  When she did so, Harrison probed further:  "What makes you high risk?"  *Id.*  Holmes asked why Harrison needed this personal information.  *Id.* ¶ 38.  Harrison responded that she needed to make sure Holmes was not "abusing her leave"—notwithstanding that Holmes was clearly pregnant and that the director of human resources had approved her request for leave to attend the two pregnancy-related doctors' appointments.  *Id.*  Harrison also encouraged Holmes to take "FMLA leave immediately," even though doing so would have exhausted Holmes's family leave before her due date, and even though Holmes "had never indicated that she was unable to perform the functions of her position."  *Id.* ¶ 39.  "Fearing that she was being pushed out," Holmes responded that "it was unnecessary for her to begin taking FMLA immediately and that she was not interested in taking leave before the baby was born."  *Id.*

Holmes again contacted the Human Resources Department, and this time spoke with a different official.  *Id.* ¶ 40.  The new official expressed "shock[]" at Harrison's "inappropriate questioning" and told Holmes "not to try to 'explain' anything further" to Harrison.  *Id.*

**C.**     **Holmes's Medical Leave and Termination**

On July 3, 2014, Holmes was diagnosed with intrauterine fetal growth restriction and preterm labor. *Id.* ¶ 41. Her doctor placed her on "complete bed rest" due to the high risk of premature delivery. *Id.* ¶ 42. She accordingly requested FMLA medical leave for the period from July 7, 2014, to her expected delivery date on September 20, 2014. *Id.* ¶ 43; *see id.* ¶ 68. The University approved her request. *Id.* ¶ 43. The University's human resources compliance officer explained to Holmes that, under the DCFMLA, her "job would be protected during the period of time that she took [DCFMLA] leave." *Id.* ¶ 46.

On August 27—while Holmes was on protected leave—she saw the University advertising her job online. *Id.* ¶ 45. She again reached out to the human resources compliance officer, who expressed concern and surprise. *See id.* ¶¶ 46–47. A week later, the compliance officer still could not provide her any information. ¶ 48. Holmes was left in a state of "extreme stress and anxiety," "[n]ot knowing whether she would have a job to return to" after she gave birth. *Id.* ¶ 49. She developed high blood pressure and medical complications, and her doctor recommended inducing labor. *Id.*

On September 2, 2014, Holmes gave birth to her child. *Id.* ¶ 50. Shortly thereafter, Holmes noticed an email from Harrison in her personal account, dated August 29. *Id.* ¶ 51. Harrison's email informed Holmes that the University "was not renewing her appointment" and that, accordingly, "her employment would end on September 30, 2014." *Id.* Harrison gave no reason for the termination. *Id.* ¶ 53. Holmes alleges that "Harrison made, or was centrally involved in, the decision to terminate [her] employment." *Id.* ¶ 52. Her position had not been defunded; the University had simply replaced her with a male employee. *Id.* ¶ 56.

In light of the University's decision not to renew her appointment, Holmes applied for

and received FMLA family leave for the period from September 20—the date on which her

medical leave was set to expire—to September 30—the date on which her termination became

effective.  *Id.* ¶¶ 58-59.  Had she not been terminated, she would have applied for approximately

14 additional weeks of family leave.  *Id.* ¶ 59.

**D.      The Current Lawsuit**

Holmes's amended complaint asserts nine counts against the University:  unlawful

interference under the DCFMLA (count one); unlawful retaliation under the DCFMLA (count

two); pregnancy discrimination under Title VII and the DCHRA (counts three and four);

disability discrimination under the ADA and the DCHRA (counts five and six); sex stereotype

discrimination under Title VII (count seven); marital status discrimination under the DCHRA

(count eight); and family responsibility discrimination under the DCHLA (count nine).  *See* Am.

Compl. ¶¶ 65–136.  The University has moved under Rule 12(b)(6) to dismiss every count for

failure to state a claim upon which relief can be granted.  Dkt. 19.

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In

evaluating such a motion, the Court "must first 'take note of the elements a plaintiff must plead

to state the claim' to relief, and then determine whether the plaintiff has pleaded those elements

with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v.

District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations and citation omitted) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  "A claim has facial plausibility when the

pleaded factual content allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  A complaint may proceed even if

"recovery is very remote and unlikely," but the alleged facts must still "raise a right to relief

above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

## III.  ANALYSIS

### A.     DCFMLA Interference

#### 1.  *Rights Under the DCFMLA*

Employees covered by the DCFMLA are entitled to 16 workweeks of "family leave" and

16 workweeks of "medical leave" during any 24-month period.  D.C. Code §§ 32-502(a),

32-503(a).  Family leave is available for, among other things, the birth of the employee's child.

*Id.* § 32-502(a)(1).  Medical leave is available to any employee who "becomes unable to perform

the functions of the employee's position because of a serious health condition."  *Id.* § 32-503(a).

And the DCFMLA guarantees that, subject to exceptions not raised here, a returning employee

"shall be restored" to the position she held when she left or to another equivalent position.  *Id.*

§ 32-505(d).  The DCFMLA further makes it "unlawful for any person to interfere with, restrain,

or deny the exercise of . . . any right provided by" the Act.  *Id.* § 32-507(a).  "If an employer

interferes with the [DCFMLA]-created right to [family leave,] medical leave[,] or to

reinstatement following the leave, a deprivation of this right is a violation regardless of the

employer's intent."  *Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1076 (D.C. 2008).

But "the DCFMLA does not create an absolute right to reinstatement."  *Id.* at 1077.  No

reinstatement is necessary if the employer can show that "[the] employee would not otherwise

have been employed at the time reinstatement is requested."  *Id.* (quoting 29 C.F.R. 825.216(a)

and treating it as authoritative guidance for the DCFMLA).  For example, "[i]f an employee was

hired for a specific term," then "the employer has no obligation to restore the employee if the

employment term . . . is over and the employer would not otherwise have continued to employ the employee." 29 C.F.R. 825.216(a)(3).  The burden of proof on this issue lies with the employer.  *See Wash. Convention Ctr. Auth.*, 953 A.2d at 1077.

2.  *Holmes's Allegations of Interference*

Accepting the allegation contained in the amended complaint as true, Holmes took 11 workweeks of medical leave, covering the period between July 7 and September 20, 2014.  Am. Compl. ¶ 43.  She then took almost 2 workweeks of family leave for the birth of her child, covering the period between September 20 and September 30, 2014.  *Id.* ¶ 59.  At that point, the DCFMLA entitled her to take an additional 14 weeks of family leave for the birth of her child, *see* D.C. Code § 32-502(a)(1), and, more importantly, to "be restored" to her position or an equivalent upon her return, *see id.* § 32-505(d).  Neither event occurred, however, because the University terminated her employment effective September 30.  Am. Compl. ¶ 51.  Holmes has therefore stated a claim for DCFMLA interference.

3.  *The University's Affirmative Defense*

The University resists this conclusion, arguing that the position's "sponsored program appointment" structure defeats Holmes's interference claim as a matter of law.  *See* Dkt. 19-1 at 8–11.  It contends that Holmes "did not have a position to which to be restored;" that she had "no automatic right to continued employment" after her then-current appointment expired; and that her employment "would have automatically expired by its own terms on September 30, 2014," unless the University took affirmative steps to renew it.  *Id.* at 8–9.  These arguments lack merit at the motion to dismiss stage.

*Miles v. University of the District of Columbia*, No. 12-cv-378, 2013 WL 5817657 (D.D.C. Oct. 30, 2013), is instructive on this point.  The plaintiff in that case, Candice Miles, had

also worked in a "[s]ponsored [p]rogram [a]ppointment" at the University.  *Id.* at *2.  But the sponsor allegedly withdrew funding while Miles was on maternity leave, causing her position to cease to exist.  *See id.* at *3, *5.  The University moved to dismiss her DCFMLA interference claim on the ground that, because Miles's position had been abolished, she was "no longer eligible for reinstatement" when her leave came to an end.  *Id.* at *12.  The district court, however, denied the motion.  Although the University could raise the *affirmative defense* that Miles "would not otherwise have employed at the time [she requested] reinstatement," *id.* at *12 (quoting 29 C.F.R. § 825.216(a)), it could not establish that defense on the basis of the alleged facts alone, *see id.* at *13.  As the district court explained, Miles had alleged that the sponsor withdrew funding, and the University abolished the position, because of her complaints, whereas the University maintained that the sponsor would have withdrawn its funding "regardless of [those] complaints."  *Id.*  "On this record," the court concluded, "dismissal . . . would be inappropriate."  *Id.*

Here, the University's position is, if anything, weaker than the one it occupied in *Miles*. Unlike Miles, Holmes alleges that her job *continued to exist* after she was terminated.  Her position was already funded through 2015; the University simply decided to replace Holmes with a male employee.  Am. Compl. ¶¶ 55, 56.  The University's assertion that Holmes had "[no] position to which to be restored," Dkt. 19-1 at 8–9, is at odds with those alleged facts.

The University is correct that Holmes had "no automatic right" to employment; all parties agree that whether to renew Holmes's appointment "was a matter of managerial discretion." Dkt. 21 at 20; *accord* Dkt. 19-1 at 9.  But that means nothing more than that Holmes's employment was functionally "at-will."  Indeed, the University's own documents explain that "[s]ponsored program appointments . . . are essentially indefinite term appointments," which

management can opt to extend or not.  Dkt. 20-1 at 4–5.  And neither party contends that at-will employees have any fewer DCFMLA rights than anyone else.  Dkt. 21 at 16–17, 20–21; Dkt. 24 at 6–7.  The lack of an "automatic right" to employment is no reason to dismiss this interference claim out of hand.[1]

That leaves what seems to be the University's real argument:  that, under D.C. Municipal Regulations, "the University could have done nothing"—*i.e.*, could have chosen not to renew Holmes's appointment—and her appointment "would have automatically expired by its own terms on September 30, 2014."  Dkt. 19-1 at 9.  Yet, even if true, that premise is insufficient by itself to sustain the University's affirmative defense.  To be sure, when an employee is "hired for a specific term," and when that term ends while she is on protected leave, then the employer can avoid liability by showing that it "would not otherwise have continued to employ [her]" at the time she sought reinstatement.  29 C.F.R. 825.216(a)(3); *accord Wash. Convention Ctr. Auth.*, 953 A.2d at 1077.  But, for the University's affirmative defense to prevail at this stage of the proceeding, "the allegations in the complaint [must] suffice to establish" it.  *Jones v. Bock*, 549 U.S. 199, 215 (2007).  They do not.  At best, the University has shown that it *could* have declined to extend Holmes's appointment on September 30, 2014, consistent with municipal regulations.  But nothing in the complaint establishes that the University *would* have done so, even if Holmes had not taken protected medical leave.  To the contrary, Holmes's complaint alleges that it was standard practice for employees in her position to see their appointments

---

[1]  For the same reason, the University's reliance on the principles that "equitable estoppel will not lie against the Government as against private litigants," *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990), and that the extent of an employee's due process "property interest" in continued employment is "created and defined by the terms of his appointment," *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972), is misplaced.  *See* Dkt. 19-1 at 9–11; Dkt. 24 at 8–10, 12.  Holmes does not contend, nor does her interference claim require her to show, that the University was legally obligated to renew her appointment.  Dkt. 21 at 20–21.

renewed each year; that the University advised her that she "should expect to have [her] employment continued on a regular basis;" that the University had renewed her appointment as a matter of course in the past; and that she had at all times ably performed her job.  Am. Compl. ¶¶ 16–19.  None of this is consistent with the contention that the University was on track to decline her re-appointment—and, indeed, the University never asserts (and, more importantly, has no basis in the pleadings to assert) that it had any legitimate reason to do so.  Although the University may raise this defense later in the proceedings, at the present stage of the litigation, the defense is unavailing.

      The motion to dismiss is **DENIED** as to count one.

## B.    Discrimination/Retaliation

      The other counts in Holmes's complaint allege that the University declined to renew her appointment because of unlawful retaliatory or discriminatory animus.  Specifically, Holmes alleges that the University declined to renew her appointment (1) because she exercised her rights by taking approximately eleven weeks of protected medical leave, Am. Compl. ¶¶ 75–77 (DCFMLA retaliation); (2) because she was pregnant, *id.* ¶¶ 83, 91 (Title VII and DCHRA pregnancy discrimination); (3) because she "suffered from pregnancy-related physical impairments that substantially limited one or more of her major life activities," *id.* ¶¶ 97, 99, 106, 108, including the intrauterine fetal growth restriction and preterm labor that forced her into "complete bed rest" throughout July and August, 2014, *id.* ¶¶ 41–42 (ADA and DCHRA disability discrimination); (4) because of "her nonconformity with female sex stereotypes," in that "she was neither living with nor married to [her] child's father," *id.* ¶¶ 114–16 (Title VII sex discrimination); (5) because "she had a child out of wedlock," *id.* ¶ 125 (DCHRA marital status discrimination); and (6) because she "was, or had the potential to become, a contributor to the

support of a person in a dependent relationship—her newborn son," *id.* ¶ 131–33 (DCHRA family responsibilities discrimination).

The University does not dispute that such motivations are unlawful under the statutes that Holmes invokes. *See* Dkt. 19-1 at 11–27. Nor does it dispute at this time that the decision not to renew Holmes's appointment constitutes an "adverse employment action." *See id.* at 17. Instead, its motion to dismiss these counts consists largely of the assertion that Holmes "has failed to allege any facts that give rise to an inference of [retaliatory or] discrimin[atory]" intent. Dkt. 19-1 at 17; *see id.* at 13–15 (retaliation); *id.* at 17–19 (pregnancy); *id.* at 20–21 (sex stereotype); *id.* at 23–24 (disability); *id.* at 25–26 (marital status); *id.* at 26–27 (family responsibilities). This line of argument is doubly flawed.

First, the University invokes the wrong legal standard. Although the University does not articulate one consistent standard, much of its brief attacks the amended complaint on the ground that it fails "[t]o establish a prima facie" case. Dkt. 19-1 at 11. It argues, for example, that the amended complaint does not "establish pretext," *id.* at 12, relies too heavily on "temporal proximity," *id.*, and fails to identify "similarly situated employees" to serve as comparators, *id.* at 17. These factors may all be fair game at summary judgment or at trial. *See*, *e.g.*, *Nurriddin v. Bolden*, 818 F.3d 751, 758 & n.6 (D.C. Cir. 2016) (Title VII); *accord Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5–6 (D.C. Cir. 2015) (ADA and DCHRA); *Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 329–30 (D.C. 2004) (DCFMLA retaliation). At the pleading stage, however, Holmes's burden is "substantially [less] onerous." *Nanko Shipping, USA v. Alcoa, Inc.*, --- F.3d ---, 2017 WL 943947, at *4 (D.C. Cir. Mar. 10, 2017). Although she must allege sufficient factual content for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, the D.C. Circuit "ha[s]

been clear": "[A]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case," *Brown v. Sessoms*, 774 F.3d 1016, 1020, 1023 (D.C. Cir. 2014). *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002); *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161–62 (D.C. Cir. 2015). The University's motion thus improperly demands a factual showing that the law does not require.[2]

Second, the University fails meaningfully to grapple with the factual allegations Holmes sets forth in her complaint. Holmes has alleged specific facts which, when viewed in the light most favorable to her, arguably show the following: that Harrison publicly embarrassed Holmes for being pregnant; that she expressed disapproval of having a child while not living with or married to her child's father; that she went out of her way to attack Holmes for using a routine, pre-approved sick day to attend pregnancy-related doctors' appointments; that she questioned Holmes about the details of her sensitive medical condition, over Holmes's objection, without good cause; that at least one member of the human resources staff considered Harrison's behavior atypical; that Harrison had no legitimate reason for taking any of these hostile actions;

---

[2] Indeed, almost every case the University's brief cites on these issues involves the application of the summary judgment or trial standard. *See, e.g.*, *Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995); *Carr v. Reno*, 23 F.3d 525, 529–30 (D.C. Cir. 1994); *Smith v. Lynch*, 115 F. Supp. 3d 5, 20 (D.D.C. 2015); *Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 120 (D.D.C. 2015); *Edmonds v. Engility Corp.*, 82 F. Supp. 3d 337, 342 (D.D.C. 2015); *Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 427 (W.D. Pa. 2014); *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 108 (D.D.C. 2013); *Piroty v. Chairman, Broad. Bd. of Governors*, 815 F. Supp. 2d 95, 100 (D.D.C. 2011); *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 142 (D.D.C. 2010); *Nuskey v. Hochberg*, 657 F. Supp. 2d 47, 58 (D.D.C. 2009); *Lytes v. D.C. Water & Sewer Auth.*, 527 F. Supp. 2d 52, 61 (D.D.C. 2007); *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 53 (D.D.C. 2007); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004); *Powell v. Washington Metro. Area Transit Auth.*, 238 F. Supp. 2d 160, 165 (D.D.C. 2002); *Pendarvis v. Xerox Corp.*, 3 F. Supp. 2d 53, 57 (D.D.C. 1998); *Milliner v. District of Columbia*, 932 F. Supp. 345, 350–51 (D.D.C. 1996); *Mulhall v. District of Columbia*, 747 F. Supp. 15, 19 (D.D.C. 1990); *Chang*, 846 A.2d at 331–32. The brief cites four opinions that concern motions to dismiss. *See* Dkt. 19-1 at 11–29.

that Harrison failed to identify any reason for declining to renew Holmes's employment; and that, even though Holmes had "performed her duties and responsibilities well," Am. Compl. ¶ 19, the University filled her position with a male replacement. *See supra* Part I.B. Holmes further alleges that Harrison played a central role in the University's decision not to renew Holmes's appointment while she was on job-protected leave, *see* Am. Compl. ¶ 52—a claim that Holmes bolsters through the specific allegations that Harrison served as Holmes's supervisor throughout the relevant time period, *see id.* ¶¶ 16, 20, and that Harrison personally sent Holmes the email informing her that she was fired, *id.* ¶ 51. The University attempts to downplay these detailed factual allegations as "a couple of isolated statements," "bald speculation," and "conclusory allegations . . . bereft of any facts," Dkt. 19-1 at 13, 20–21, but the Court is not convinced. Although it is not the Court's role to decide whether the inferences that Holmes posits are ultimately persuasive, they are sufficient to "nudge[]" her claims of discrimination "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The Court need only briefly address the University's other arguments.

### 1. *DCFMLA Retaliation*

With respect to Holmes's DCMFLA retaliation count, the University makes some arguments in addition to those described above. None are persuasive.

*First*, the University argues that Holmes must allege proof of a causal connection "other than the temporal proximity" between the non-renewal of her appointment and her DCFMLA-protected medical leave. Dkt. 19-1 at 12 (citing *Chang*, 846 A.2d at 331–32). That is not the law. As the University's own citation explains, for purposes of a *prima facie* case, "close temporal proximity between a protected activity and an adverse employment action *can* establish [the requisite] causal connection." *Chang*, 846 A.2d at 329 (emphasis added). In *Chang*, for

example, the plaintiff satisfied her *prima facie* showing on causation with evidence that "she took protected medical leave and was fired on the day she was to have returned to work." *Id.* The temporal nexus in Holmes's case is even tighter:  she was fired *before* she was scheduled to return.  Am. Compl.  ¶¶ 43, 51.  Thus, even if Holmes were required to establish a *prima facie* case at the pleading stage, she has done so here successfully.  The rule that temporal proximity and satisfactory work performance are not sufficient to show pretext in retaliation cases, moreover, comes into play only after an employer offers a nondiscriminatory justification for taking an adverse employment action, thereby shifting the burden back to the plaintiff to show that the proffered justification is, in fact, pretextual.  *See Chang*, 846 A.2d at 330–31; *cf., e.g.*, *Allen v. Johnson*, 795 F.3d 34, 47 (D.C. Cir. 2015).  Neither event has occurred here.

*Second*, the University argues that, because Holmes's appointment "expired as a matter of law on its own terms, she cannot establish the necessary causation."  Dkt. 19-1 at 12–13, 15–16.  That is a non sequitor.  At least for present purposes, there is no dispute that the University's decision not to renew Holmes's appointment was an adverse employment action.  If the University undertook that action for discriminatory reasons, the University is liable.  The Court fails to see how the position's term-based appointment structure alters this conclusion.  The University's reliance on *Mulhall v. District of Columbia*, 747 F. Supp. 15, 19 (D.D.C. 1990), moreover, is inapposite.  Like almost every opinion on which the University relies, *Mulhall* applied the more demanding summary judgment standard.  At summary judgment or trial, the University will have the opportunity to prove that it would have terminated Holmes's employment—or would have allowed her appointment to lapse—for legitimate, non-discriminatory reasons.  If it can do so, and if Holmes is unable to rebut that showing, the

University will be entitled to prevail on Holmes's discrimination claims.  That, however, is not a question that is properly before the Court at this stage of the proceeding.

*Third*, the University argues that it is implausible "that the same entity that approved [Holmes's] request for DCFMLA [medical] leave [later] retaliat[ed] against her for using that leave." Dkt. 19-1 at 13.  But, of course, there is nothing implausible about that allegation at all. Were the University correct, any time an employer approved an employee's DCFMLA-leave, but refused to reinstate that employee when the leave came to an end, the employer would be immune from liability.  That is plainly not the law.  *See, e.g.*, *Chang*, 846 A.2d at 329 (holding that an employee stated a *prima facie* DCFMLA retaliation case when her employer approved her medical leave but fired her upon return).  Likewise, there is nothing to the University's contention that Holmes has pleaded "inconsistent allegations," because she has alleged that Harrison *was not* involved in the process for approving Holmes's one day of sick leave, but *was* involved in the decision not to renew Holmes's contract.  *See* Dkt. 19-1 at 15.  That is a question of fact, not logic.

*Fourth*, the University argues that it "had no obligation to renew [Holmes's] temporary appointment"—a proposition Holmes does not dispute—so the DCFMLA could not have created such an obligation, either.  Dkt. 19-1 at 15.  But Holmes is not claiming that the DCFMLA prohibited the University from declining to renew her appointment entirely; she is claiming that it prohibited the University from declining to renew her appointment *out of retaliatory animus*. The legal sufficiency of latter proposition is not subject to reasonable dispute.

The motion to dismiss is **DENIED** as to count two.

2. *Pregnancy Discrimination*

Almost all of the University's arguments regarding Holmes's pregnancy discrimination claim posit a lack of discriminatory intent, *see* Dkt. 19-1 at 16–20, which the Court has already addressed.  Two arguments remain.

*First*, the University contends that Holmes "has failed to allege any facts that give rise to an inference of discrimination based upon her pregnancy" because "[s]he does not allege that the University treated other similarly situated employees not in her protected class more favorably under the same factual circumstances."  Dkt. 19-1 at 17.  But, not only is such evidence unnecessary at the pleading stage, it is also unnecessary at trial.  *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (holding that, although pointing to similarly situated employees whom the employer treated differently is "[o]ne method" for giving rise to an inference of discrimination, it "is not the only way").  And, in any event, Holmes alleges that her non-pregnant male predecessor saw his appointment renewed as a matter of course over the previous five years.  Am. Compl. ¶ 17.  The University's contention that he is an invalid comparator because he did not take "an extended medical leave for a medical condition," Dkt. 24 at 19, is difficult to fathom; the fact that Holmes engaged in activity protected by the DCFLMA cannot possibly provide a justification for treating her less favorably than her male predecessor.

*Second*, the University argues that, because Harrison "knew about [Holmes's] pregnancy for almost eight (8) months before deciding not to renew her [appointment]," Holmes cannot establish that Harrison declined to renew the appointment "because of" her pregnancy.  Dkt. 19-1 at 19.  For support, the University cites the rule—borrowed from the retaliation context—that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" cannot establish the causality prong of a *prima facie* case unless the

18

proximity is "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  But this

reasoning is confused.  The claim here is not that the University *retaliated* against Holmes for

becoming pregnant; it is the University *discriminated* against Holmes for becoming pregnant.

Harrison's knowledge of Holmes's protected status for a lengthy period of time does not

undermine that claim.  On the University's logic, an employer could defeat allegations of racial

discrimination, for example, by claiming that it was aware of the plaintiff's race for many

months before engaging in the allegedly discriminatory conduct.  That is not the law of racial

discrimination.  It is not the law of pregnancy discrimination, either.

  The motion to dismiss is **DENIED** as to counts three and four.

  3. *Disability Discrimination*

  Much of the section of the University's motion concerning disability discrimination

consist of the threadbare assertion that Holmes has alleged no facts to suggest discriminatory

intent.  Dkt. 19-1 at 23–24.  The Court has already addressed that contention.  The University's

only additional argument as to disability discrimination is the following:

  The University accepts for purposes of its motion that Holmes was "disabled" within the

meaning of the relevant statutes between the start of her bedrest on July 7, 2014, and the birth of

her child on September 2, 2014.  *See* Dkt. 19-1 at 22–23.  And the complaint alleges that on

August 29, 2014, the University notified Holmes that it had not renewed her appointment, so her

job would terminate on September 30, 2014.  Am. Compl. ¶ 52.  So there is no dispute that

Holmes was in the protected class of disabled individuals at the time the University decided to

terminate her.  The University contends, however, that the operative date is not when the

University decided to terminate Holmes, but rather when her termination became effective.

Thus, it says, because Holmes's termination did not formally become effective until September

30, 2014—after the birth of her child—Holmes "was [not] disabled at the time of her

termination," and she therefore cannot invoke the protections of the ADA.  *See* Dkt. 19-1 at 23.

The University's position is untenable.  "[T]he two basic elements of a disability

discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because

of the plaintiff's disability."  *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir.

2008).  Plaintiff has alleged both essential elements.  Moreover, although the ADA bars

discrimination against "a qualified individual *with* a disability," 42 U.S.C. § 12112(a) (emphasis

added), there is no dispute that at the time the University decided not to renew Holmes's

employment—that is, at the time it allegedly discriminated against her—she was suffering from

"intrauterine fetal growth restriction and preterm labor."  Am. Compl. ¶ 41.  That fact that she

suffered the consequences of that alleged discriminatory act after she gave birth does not vitiate

what was, at the time it occurred, an allegedly unlawful act.

The motion to dismiss is **DENIED** as to counts five and six.

4.  *Sex Stereotype Discrimination*

The University's argument regarding Holmes's sex stereotype discrimination claim

consists of only the following argument, which warrants quoting in full:

> The courts require more than a couple of isolated statements . . . for a plaintiff to
> meet her burden of pleading a claim of discrimination based upon sex stereotypes.
> For example, in *Nuskey v. Hochberg*, 657 F. Supp. 2d 47, 58 (D.D.C. 2009), the
> court held that a supervisor's statements that plaintiff was a "strong woman" and
> an "aggressive woman" were not sufficient to establish sex discrimination on the
> basis of gender or sex stereotypes.

Dkt. 19-1 at 20–21.  The University, however, misstates the case on which it relies.  In fact,

*Nuskey* denied *the employer's* motion *for summary judgment*, on the ground that those "isolated

statements" created a genuine issue of material fact as to whether the plaintiff's termination

resulted from discriminatory animus.  657 F. Supp. 2d at 58.  In other words, the "isolated

statements" were sufficient to permit the plaintiff to survive summary judgment.  It follows that they would also be sufficient to survive a motion to dismiss.

The motion to dismiss is **DENIED** as to count seven.

5.  *Marital Status Discrimination*

The University makes only two arguments regarding Holmes's marital status discrimination claim:  First, once again relying on a case applying the summary judgment standard, it argues that "stray comments" are insufficient to permit an inference of discriminatory intent.  Dkt. 19-1 at 25 (citing *Piroty v. Chairman, Broad. Bd. of Governors*, 815 F. Supp. 2d 95, 100 (D.D.C. 2011)).  But the Court has already explained why that standard has no bearing on the adequacy of Holmes's complaint and, in any event, construing the allegations of the complaint and drawing all inferences in Holmes's favor, the Court cannot conclude that Harrison's alleged comments were "stray."  Second, the University asserts that Holmes "has failed to provide any facts from which to conclude that her marital status motivated the decision not to renew her appointment" because Holmes has failed to allege the existence of similarly situated employees who were treated differently.  *Id.* at 25–26.  But the Court has already explained that such comparators are not required at any stage of the litigation.  *See George*, 407 F.3d at 412; *supra* Part III.B.2.  As explained above, when read in the light most favorable to Holmes, the amended complaint alleges a plausible claim that Harrison discriminated against her because she was pregnant, but not married.  That is sufficient to state a claim for discrimination based on marital status.

The motion to dismiss is **DENIED** as to count eight.

6. *Family Responsibility Discrimination*

So too has the Court disposed of the University's arguments as to the family responsibility discrimination count.  The University reiterates its assertions that Holmes has neither alleged facts suggestive of discriminatory treatment nor identified the existence of comparators.  Dkt. 19-1 at 26–27.  These arguments are unavailing for the reasons already recounted at length.

The motion to dismiss is **DENIED** as to count nine.

## CONCLUSION

The University's motion to dismiss the amended complaint (Dkt. 19) is hereby **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 23, 2017